UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Teresa M. Halvorson,

Plaintiff,

Civ. No. 01-1774 (RHK/AJB)
**MEMORANDUM OPINION AND ORDER**

v.

Conseco Finance Corp.,

Defendant.

---

James H. Kaster and Jennifer A. Kitchak, Nichols, Kaster & Anderson, Minneapolis, Minnesota, for Plaintiff.

Ann Huntrods, Briggs and Morgan, Saint Paul, Minnesota, for Defendant.

---

## Introduction

Plaintiff Teresa Halvorson ("Halvorson") brought this action for sex discrimination against her employer, Defendant Conseco Finance Corp. ("Conseco Finance") under Title VII of the Civil Rights Act of 1964 (Title VII), and the Minnesota Human Rights Act, (MHRA).[1] 42 U.S.C. § 2000(e) *et seq.*; Minn. Stat. § 363.01 *et seq.* Halvorson bases her

[1]Although Halvorson also brought claims for disability discrimination under the ADA and MHRA, negligent supervision and retention, and invasion of privacy under Minnesota common law, she abandoned them after Conseco Finance moved for summary judgment. Accordingly, the Court will dismiss those claims with prejudice.



FILED OCT 21 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD OCT 21 2002
DEPUTY CLERK

claim upon a sexual encounter she had with an employee of Conseco Agency, Inc. ("Conseco Agency"), a wholly owned subsidiary of Conseco Finance, during a business trip to Tempe, Arizona. Conseco Finance moves for summary judgment on the grounds that (1) based on Halvorson's own testimony, she never indicated that the sexual encounter was unwelcome, and (2) the employee of Conseco Agency with whom she had the encounter was neither her supervisor nor apparent supervisor. Because the Court finds there is no dispute of material fact and Conseco Finance is entitled to judgment as a matter of law, summary judgment will be granted.

## Background

Teresa Halvorson is a thirty-four-year-old software engineer who has struggled with alcohol.[2] She began work at Conseco Finance,[3] a diversified financial services company, on May 8, 2000, as a lead staff application developer. (Huntrods Aff. Ex. 2 (Position Requisition Form).) Shortly after beginning work, Halvorson requested a medical leave to enter a substance abuse clinic because her problems with alcohol had become severe. (Kitchak Aff. Ex. N (Halvorson Dep.) at 127-28.) Halvorson was admitted to the Fountain Lake Treatment Center where she underwent in-patient treatment from May 28, 2000, until June 21, 2000. (Id. at 128.) After she returned to

---

[2]Because of the procedural posture, the Court relies on Halvorson's testimony.

[3]Conseco Finance is a wholly owned subsidiary of Conseco, Inc.

work, Halvorson continued to struggle and had several relapses.[4] In December, she began attending Fountain Lake Treatment Center's aftercare program for alcohol treatment. (Huntods Aff. Ex. 7 (Fountain Centers Attendance Record).) She remained sober between early December and her trip to Tempe, Arizona nearly three months later. (Kitchak Aff. Ex. N at 332.)

Among Halvorson's responsibilities was to help develop an insurance software program called the "Rating Router" for Conseco Agency, a wholly owned subsidiary of Conseco Finance. (Id. at 116.) Halvorson testified that her division, Technical Services, treated Conseco Agency as an "internal customer." (Id. at 117, 188, 189.) Her contact at Conseco Agency was Jeff Serrano. (Id. at 170.) Halvorson learned from her supervisor that Serrano and Mark Bonjean, Vice President of Direct Marketing at Conseco Agency, wanted her to come to Tempe, Arizona to assist with the installation of the Rating Router system. (Id. at 177.) Serrano and Halvorson spoke frequently about personal as well as business matters, and during one of these conversations, Halvorson testified that she may have told Serrano that she thought Bonjean was good looking. (Id. at 178.) Halvorson also testified that she had a telephone conversation with Bonjean in which he stated that

---

[4]For example, in October 2000, Halvorson was arrested for driving under the influence of alcohol in Dakota Country. (Huntrods Aff. Ex. 11 (Pl.'s Ans. to Def.'s Interrogs.) No. 17.) In November 2000, she consumed alcohol with Conseco Finance employees at an after work function. (Kitchak Aff. Ex. N. at 160-61.) In December 2000, she consumed nearly a liter of vodka prior to a Conseco Finance Christmas party and subsequently experienced an alcohol related blackout. (Id. at 165.)

the prize for the "name the system" contest should be a date with her. (Id. at 237.) At the time, she believed Bonjean to be joking. (Id.)

On February 26, 2001, Halvorson traveled to Tempe, Arizona to assist with the installation of the Rating Router. (Am. Compl. ¶ 8.) Halvorson's first substantial contact with Bonjean came when she installed the software on his laptop. (Kitchak Aff. Ex. N at 181-82.) According to Halvorson, their conversation centered upon alcohol:

> We went into [Bonjean's] office together. It was Jeff [Serrano], Mark [Bonjean] and myself. I think the door was open. Jeff was in front of the desk. Mark was at the desk, and then I was over by Mark working on his laptop, getting the connections for him; and then he started talking to me about, he said, "Hey, do you like to party? You look like a party girl." And I said, "I used to, but not anymore." He says like, "What? What do you mean you don't party anymore?" And I said, "No I used to but then I started having problems with alcohol and now—and now I don't." And he says, "Oh, come on." And I said, "Jeff" – let me slow down here and think. I told him, no, that I was having problems with alcohol and this year I've been struggling at not drinking and that I didn't party. Then . . . [h]e says, "Come on, you'll party with me, won't you?" I said, "No Mark, I can't. Jeff, tell him I can't." And Jeff said, "She can't drink Mark." And I said, "See, I'm an alcoholic. I can't drink, Mark." So then I just kind of blew him off, finished with his computer, and we left the office.

(Id. at 182-83.) Bonjean subsequently asked Serrano and Halvorson to dinner. According to Halvorson, Bonjean pointed at her and said, "I'll get you drunk." (Id. at 183.) Later, Bonjean confirmed their reservations and told Halvorson he would meet her and Serrano at the restaurant: "And then we'll party." (Id. at 184.)

Serrano drove Halvorson to the restaurant. (Id. at 183-84.) When they arrived, Bonjean was sitting alone at a four-person table. (Id. at 198.) After they sat, Bonjean

raved about the quality of the food and atmosphere at the restaurant. (Id. at 199-200.) Halvorson ordered water and Serrano ordered an alcoholic drink. (Id. at 200.) Bonjean suggested to Halvorson and Serrano that they try some appetizers, which he then selected. (Id. at 201.) After the appetizers arrived, Bonjean asked Halvorson what kind of wine she would like. (Id. at 202.) She replied, "Mark, wine is my weakest substance. Don't do this." (Id.) In turn, he responded, "Oh, come on. The appetizer will be better with wine." (Id.)

While Bonjean and Serrano both dispute Halvorson's account of what happened next, Halvorson testified that Bonjean made quite a show out of ordering the wine:

> Jeff and I pretty much sat there and listened and he talked about some of the different wines and he talked to the waitress and made – definitely made a production out of ordering this wine. He had the waitress then go get a wine, come back, you know, pour it in a glass where he would kind of swish it around, smell it, the whole nine yards that you see on television. I had never experienced anyone doing that in a restaurant in my entire life. . . . [H]e would look at me, you know, smell it and "smells good" and he'd look at me and totally toying with me through the whole production of ordering the wine. . . . [T]he appetizers were there and he gave me an appetizer and he took one and Jeff had one. And he said, "Now, this is really good. You have to try one. You have to try this with the wine." And he—he made it very clear that you have to have the appetizer and the wine together, and he was trying to make me see that and by putting—"Okay. Now, have a bit of your appetizer. Have a little bit of the wine," and putting his wine in front of me, right in front of my face even. And he just would not let up about how much better the appetizer would be with wine, that particular wine. . . . I was feeling very pressured and I wasn't sure what to say because the man was not taking no for an answer. So I said, "Okay," and then I did have a sip of the wine and he poured some in my glass. I did not pour it in my glass. He poured it in my glass. And I felt that if I had a little in my glass, he would just back off and leave me alone.

(Id. at 203.) Halvorson drank from the glass while she, Bonjean, and Serrano spoke about the Rating Router and how useful it was likely to be for Conseco Agency. (Id. at 204-05.) Bonjean called Halvorson a "savior" for helping to get the project done. (Id.) He also spoke about his close, personal relationship with the president and senior vice president of Conseco Agency and how if Halvorson "st[u]ck with him," she would go far. (Id. at 207.) Halvorson took this to mean:

> [I]f I stay close friends with him, you know, not necessarily close friends but if I get his projects done, he'll help me get projects. We—we get requests from like Burnell [another vice president of Conseco Agency], we get requests from Mark, and we get requests and we have to juggle which requests get done first. So I took that as if somebody is asking me for a favor from systems from work, that they want me to jump on their project first and give them what they want.

(Id.)

The food arrived and Bonjean ordered a second bottle of wine. (Id. at 208.) Halvorson testified that, by that point, the wine was starting affect her. (Id. at 209.) Bonjean began to tease Halvorson about a relationship between herself and Serrano. (Id. at 210.) Halvorson then told a story about how her best friend Tina looks like the actress Meg Ryan and how people often come up to Tina and ask for an autograph. (Id. at 215.) Bonjean responded, "All the good looking girls hang together." (Id. at 215.)

At this point, Bonjean asked what Halvorson liked to do with her girlfriends during their spare time. (Id. at 217.) Halvorson responded:

> . . . I said we typically—we went out dancing, we go out to eat, or we—or we relax in the hot tub. So then [Bonjean] started inquiring more about the hot tub. And I

> said that, you know, we commonly—I have two girlfriends, Tina that looks like Meg, and another girlfriend that have hot tubs on their decks. Whenever I'm at their house—most of the time I'm at their house for a social get together—we go in the hot tub. The hot tubs are great. I love going in the hot tub.
>
> So then—I don't know if he asked, "What do you do in the hot tub?" He definitely was pushing the hot tub issue with me. I said, "Well, it just depends. If we went out dancing and we go back to their house and we're not planning on going in the hot tub, then we just put on a towel, go out to the hot tub, and jump in." "So you're naked in the hot tub?" "Well, yes, we're naked in the hot tub." So then, "What do you do in the hot tub?" I said, "It just depends. We talk about things. We play games. We talk about issues with husbands, boyfriends. It's a time for relaxing and socializing." "What kind of games do you play in the hot tub?" "And truth, dare, double dare, promise, the same kind of game you play when you are a kid." "What kind of dares do you do?" "I dare you to get out and run over to the neighbors and ring the doorbell and come back, would be a dare. Get out in the winter and make a snow angel and come back in. Those are the kinds of dares that we do."
>
> Anyway, things are definitely spinning for me now. I would say equivalent to about three glasses of wine, and I know the hot tub story got drilled more than if I hadn't been drinking.

(Id. at 217-18.) Halvorson also described how she attended hot tub parties with people of both genders and how "[s]ometimes people are wearing swimsuits and sometimes people are not." (Id. at 219.) Around this time, Bonjean placed his hand on Halvorson's knee. (Id. at 218.) Halvorson thought, "[T]hat's very strange." Conversation resumed on work-related topics. (Id. at 219.)

Shortly thereafter, Halvorson excused herself to use the restroom and Bonjean volunteered to show her the way. (Id. at 220.) At the entry to the restroom, Bonjean caressed Halvorson's cheek and said, "[Y]ou're so beautiful." (Id. at 220-21.) He then

entered the men's restroom while Halvorson used the women's restroom. (Id.) At that time, according to Halvorson, "[E]verything is spinning and I – I didn't know if that really happened or didn't happen and – I mean, it definitely did; and I was trying to figure out what that was about." (Id. at 221.) Upon returning to the table, she found Bonjean and Serrano engaged in conversation. According to her testimony, Halvorson had not had problems walking back to the table because she was covering the signs of her alcohol consumption. (Id. at 222.) She kept to herself while she finished her food because she was afraid she would slur her words and reveal how drunk she was. (Id.) Bonjean asked whether Halvorson would like to have a rum and cola drink called a Captain Coke. (Id. at 223.) Halvorson agreed. (Id.) As she testified, "He didn't have to push Captain Coke, you know, like he did the wine. Once I start drinking, I'll keep going." (Id. at 224.) Serrano then ordered margaritas and Halvorson drank one. (Id.) Halvorson testified that, by the time they finished their margaritas, she was "completely in [her] own little world." (Id. at 225.) Bonjean and Serrano conferred among themselves and agreed that Bonjean should drive Halvorson back to her hotel. (Id.) According to her testimony, Halvorson walked unassisted to Bonjean's car. (Id. at 226.)

On the way back to the hotel, Halvorson and Bonjean discussed "work-related" topics. (Id. at 272.) Bonjean pulled his car up to the front of the hotel but *Halvorson* directed him to drive around to the back closer to her room. (Id. at 274.) Bonjean got out of the car and removed Halvorson's bag from the backseat. (Id.) Halvorson entered her

room and Bonjean followed her in. (Huntrods Aff. Ex. N at 277.) According to Halvorson's testimony, "I believe we were still talking about some conversation from the car and we just continued to talk about it." (Id. at 274.)

Bonjean used the bathroom while Halvorson moved her cosmetics and toiletries off the bed. (Id. at 277.) Halvorson asserts that she did this because she is a "neat freak." (Id.) When Bonjean returned from the bathroom, Halvorson noticed he had done something with his shirt to appear more "casual." (Id. at 278.) Bonjean walked toward Halvorson and began kissing her neck. (Id. at 279.) While Halvorson neither jumped back nor said anything while this occurred (id. at 279) she testified that she felt scared (id. at 281). They moved to the bed together. (Id.) Bonjean used his hand to guide Halvorson into a sitting position. (Id. at 282.) As Halvorson testified, "It's not forcibly pushing me, but it's kind of leading me. . . . So I'm just going with it." (Id.) Halvorson then performed oral sex on Bonjean for "[a] couple minutes." (Id. at 283.) Bonjean pulled away, put on a condom, and began unbuckling Halvorson's dress pants. (Id. at 284.) As Bonjean pulled Halvorson's trousers down, she, according to her testimony, "lift[ed] up and help[ed]" Bonjean remove her pants. (Id.) Neither Bonjean nor Halvorson spoke during the sexual intercourse that followed. (Id.)

After the sexual intercourse, Bonjean removed his condom and went to the bathroom. (Id. at 286.) Halvorson began putting her pants back on. (Id.) Bonjean left the bathroom and began re-buttoning his dress shirt. (Id. at 287.) He then stopped, took

his dress shirt off, removed his T-shirt and threw the T-shirt in the corner. (Id.) He looked at Halvorson and said, "I don't want my wife to smell you on me. I'll just tell her I left it at the gym." (Id.) It was the first words that either of them had spoken since the beginning of their sexual encounter. (Id.) Bonjean then walked over to Halvorson, gave her a little kiss on the neck, and said something along the lines of, "I come to Minnesota frequently. I'll call you next time I'm up there." (Id. at 288.) Halvorson did not respond. (Id.) Bonjean left the room at approximately 9:15 p.m. (Id.) Halvorson estimates he was there no longer than ten minutes. (Id.)

Halvorson called Serrano shortly after Bonjean had left. (Id. at 289.) She testified that she wanted to talk to someone about what had happened because she was "definitely blaming [her]self." (Id. at 292.) As Halvorson described her feelings at that time:

> [I]t was like a freight train had hit me, and I didn't see it coming. How did I not see this coming? How did I get in this situation? How did I let this happen to me? How—you know, I've been to bars. I've been hit on plenty. I'm 34 years old and I've only slept with 4 men in my entire life. I've not had a one-night stand. How did this happen?

(Id.) While Serrano testified that Halvorson seemed "fine" on the phone and "was actually laughing about it, happy," (Kitchak Aff. Ex. O (Serrano Dep.) at 74) Halvorson described her reaction as stemming from "shock":

> [N]o matter what happens to you, try and cover up your feelings the best you can and put on a happy face. As an abused child and abused wife you learn that quickly. If you hear the words, you know, "If you cry, I'll give you something to cry about," too many times, you learn quickly and try to cover it up.

(Kitchak Aff. Ex. N at 298.)

After hanging up with Serrano, Halvorson went to the hotel bar and ordered more alcohol. (Id. at 302.) Carrying the drinks with her, she returned to the hotel room and called her boyfriend, Duane Ayers, an outside consultant for Conseco Finance. (Id. at 303.) Halvorson testified that she asked Ayers, "Why do guys always think they can fuck me?" (Id. at 305.) According to Halvorson, she was very concerned about Ayers because their relationship had just begun to become serious:

> It's like I had all these emotions and feelings going through me, and I was upset with myself. I was upset about the situation, and I didn't know what to do, plus I was a little worried about his—how he would feel. I mean, he and I have an exclusive relationship at this point. We had started in January—the middle of January. So it was an exclusive relationship. Our relationship is very strong.

(Id. at 306.) Halvorson testified that Ayers was, not surprisingly, "extremely upset." (Id. at 307.) Halvorson testified that she was "trying to protect him a little bit at the expense of [her] feelings" so she spared him all the details of her encounter with Bonjean. (Id. at 307-08.) She told Ayers she "felt like [she] had been raped" and she wanted to call the police but didn't have any proof. (Id. at 310.) Before leaving her hotel, Halvorson packed Bonjean's T-shirt and used condom because "I might need some evidence and that's all I had." (Id. at 318.)

On March 6, 2001, Halvorson returned to Saint Paul. (Id. at 24-25.) Upon returning, Halvorson asked her supervisor, Ron Williams, to take a "smoke break" with her. (Id.) During this break, Halvorson told Williams:

> Ron, I just wanted to let you know that I had a very disturbing experience when I was in Tempe with Mark Bonjean. I was very upset about it and not sure how to handle it or what to do. I considered coming home that very night on a flight, but I struggled with that decision because I knew I had thirty people up here that had worked for a year on a project that were depending on me to get it installed.

(Id. at 25.) Halvorson also testified that she and Williams talked about her being upset and that she was not sure if she would ever be able to work with Bonjean again. (Id. at 29.) Williams told Halvorson, "[I]f you're talking about what I think you're talking about, it's happened before." (Id. at 30.) Halvorson testified that Williams told her Bonjean had a reputation but did not specifically state his meaning. (Id.) Finally, Halvorson stated that she told Williams that Bonjean "is such a salesman. He's so sly. He just seems to know how to push and push and get what he wants." (Id. at 31-32.) Halvorson did not give Williams any specifics about her encounter or ask him to take any action. (Id. at 33.)

A week after she got back from Tempe, Halvorson received a phone call from Bonjean. (Id. at 35-36.) Bonjean had a question about the Rating Router system and their exchange was "totally a professional conversation." (Id.) Bonjean called her again several weeks later, asked her a professional question, and then stated, "I think I'm going – I'm going to be making a trip to Minnesota soon so let's get together and party." (Id. at 36-37.) According to Halvorson, she told Bonjean, "No, Mark, you know I don't party. I've told you that." (Id.) To which Bonjean responded, "Sure you don't. Come on, you can make time for me." (Id.) Halvorson ended the conversation with the following

statement: "Mark, I'm extremely busy. I have no time for you." (Id.) Bonjean never contacted Halvorson again. (Id. at 37.) Halvorson remains an employee of Conseco Finance to this date. (Def. Supp. Mem. at 1.)

**Standard of Decision**

"Summary judgment is appropriate only in 'those rare instances where there is no dispute of fact and where there exists only one conclusion.'" Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (quoting Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir. 1991)). If the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, then summary judgment is proper. Heaser v. Toro Co., 247 F.3d 826, 830 (8th Cir. 2001). "If the party with the burden of proof at trial is unable to present evidence to establish an essential element of that party's claim, summary judgment on the claim is appropriate because 'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" St. Jude Med., Inc. v. Lifecare Intern., Inc., 250 F.3d 587, 595 (8th Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "[S]ummary judgment should seldom be granted in discrimination cases." Bassett v. City of Minneapolis, 211 F.3d 1097, 1099 (8th Cir. 2000).

**Analysis**

Title VII forbids sexual discrimination in the workplace and imposes liability

upon employers who tolerate a hostile work environment.[5] Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 (1986). Under Title VII, a plaintiff asserting a hostile work environment claim must show: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper action. Beard v. Flying J, Inc., 266 F.3d 792, 798 (8th Cir. 1993); Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir. 1993). If discrimination is established, an employer may be held liable for it under Title VII under a variety of theories, including if the harasser is a supervisor or an apparent supervisor. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 756 (1998).

Here, Conseco Finance asserts that summary judgment is appropriate because Halvorson never indicated to Bonjean that his behavior was unwelcome. Moreover, Conseco Finance avers, even if Halvorson were able to establish harassment on the basis of her encounter with Bonjean, Conseco Finance should not be held liable because Bonjean was neither her supervisor nor her apparent supervisor.

---

[5]Prior to 1999, the Eighth Circuit applied Title VII's analysis to claims under the MHRA's employment provisions because of the substantial similarities of the two statutes. While vicarious liability under Title VII now diverges from vicarious liability under the MHRA, see Todd v. Ortho Biotech, Inc., 175 F.3d 595, 599 (8th Cir. 1999), the substantive provisions of the two statutes are still analogous. Because neither party distinguishes between the two statutes, the Court proceeds under that assumption with the caution that its analysis of unwelcome sexual advances is applicable to both statutes while its discussion of vicarious liability applies only to Title VII.

## I. Unwelcome Sexual Harassment

"The gravamen of any sexual harassment claim is that the sexual advances were 'unwelcome.'" Meritor, 477 U.S. at 68. Harassing conduct is considered unwelcome if it was uninvited and offensive. Quick v. Donaldson, Co., 90 F.3d 1372, 1377-78 (8th Cir. 1996); Bales v. Wal-Mart, 143 F.3d 1103, 1108 (8th Cir. 1998). The question of whether particular conduct was unwelcome largely turns on credibility determinations by the trier of fact. Meritor, 477 U.S. at 68. *"The correct inquiry is whether [plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome."* Id. (emphasis added).

Halvorson's claim centers on her sexual encounter with Mark Bonjean on the evening of February 26, 2001, and Conseco Finance's allegedly inadequate response. (See Pl.'s Opp'n Mem. at 1-2.) Halvorson argues that her version of that night's events provides an adequate basis upon which a reasonable jury could find that Bonjean's behavior was unwelcome:

> Halvorson testified that Bonjean pressured her to drink alcohol throughout the evening until she became intoxicated. (Halvorson Dep. at 202.) Halvorson testified that Bonjean decided to drive back to her hotel. (Id. at 225.) Halvorson testified that she did not invite Bonjean into her room, nor did she solicit or invite Bonjean's sexual advances. (Id. at 274.) Halvorson testified that Bonjean initiated the sexual encounter. (Id. at 289.) Halvorson testified that during the encounter, she was scared, and that the encounter left her feeling like she had been raped. (Id. at 281, 310.)

(Pl.'s Opp'n Mem. at 13.)[6]

After examining Halvorson's testimony regarding these events, the Court concludes that a reasonable jury could not conclude that she "indicate[d] by her conduct that the harassment was unwelcome." Beard, 266 F.3d at 798; see also Meritor, 477 U.S. at 68. While it may be clear that Halvorson considered Bonjean's advances unwelcome in retrospect, even the summary above is devoid of any indication that Halvorson conveyed these feelings to Bonjean. Rather, Halvorson concedes that at dinner she was "hiding her feelings about how she felt about alcohol consumption and other things." (Kitchak Aff. Ex. N at 298-99.) After Bonjean kissed her, Halvorson admits that she did not say "anything to indicate to him that he should stop or leave." (Id. at 282.) Indeed, throughout the evening, Halvorson acknowledges that she did not do or say "anything overtly to tell Mr. Bonjean that [she] was unwilling to participate in sex with him." (Id. at 310.) It was not until several weeks *after* their sexual encounter that Halvorson proffered an actual objection to Bonjean's advances; notably, when she told Bonjean, "I have no time for you" (id. at 36-37) he never contacted her again (id. at 37). Indeed, the only

[6] This mischaracterizes Halvorson's testimony. Although she testified that she did not invite Bonjean into her room, nowhere on either the cited page or anywhere else in the record the Court can locate does Halvorson state that she did not "solicit or invite Bonjean's sexual advances." Id. Instead, Halvorson appears to be aspirationally projecting a strand of Eighth Circuit case law onto the facts at hand. See Moylan v. Maries County, 792 F.2d 746, 749 (8th Cir. 1986) ("In order to constitute harassment, the conduct must be "unwelcome" in the sense that the employee did not *solicit or invite* it, and the employee regarded the conduct as undesirable or offensive.") (emphasis added).

objection Halvorson appears to have lodged during that night that forms the basis of her complaint was to Bonjean's offer to pour her first glass of wine. (Id. at 202.) While the Court is sympathetic to Halvorson's claim that as an abused wife she had "learned that struggling only makes it worse" (id. at 280) Rule 56(c) requires that she produce some indicia of conduct by which a jury could infer that Bonjean's attentions were unwelcome, see Fed. R. Civ. P. 56(c). The Court finds none.

Halvorson appears to argue in the alternative that by "plying" her with alcohol, Bonjean rendered her unable to consent to sex, and thus, unable to declare his advances unwelcome.[7] As Halvorson testified, "The fact that I was drinking should mean unwilling. If I had been sober, it would have been a different story." (Kitchak Aff. Ex. N at 310-11.) The Court is mindful of the Supreme Court's command that the proper inquiry is "not whether [plaintiff's] actual participation in sexual intercourse was voluntary" but "whether [plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome." Meritor, 477 U.S. at 68. Nonetheless, assuming *arguendo*

---

[7]Halvorson concedes that she made a substantial effort to conceal the level of her intoxication prior to the sexual encounter with Bonjean in her hotel room. This, she testified, she learned how to do over her long history of drinking:

> I did not want people to know when I was doing heavy drinking. It was a coping mechanism for me. So part of trying to hide it would be if my speech is starting to slur, then I just become quiet, just don't talk. I really didn't have a problem walking. I learned to balance very well, take things maybe a little bit slower. I learned to really focus on the activity I'm doing at the time, block everything else out so that I can get that activity done in a satisfactory performance. You know, that's a – that's a learned process over time of drinking.

(Kitchak Aff. Ex. N at 265.)

that the rape laws provide an analogous context from which the Court could determine whether Halvorson lacked the capacity to indicate that Bonjean's advances were unwelcome, her claim still fails.

Under modern rape jurisprudence, the victim's intoxication is generally relevant either where the defendant has administered intoxicants to the victim against her will or where a victim has become voluntarily intoxicated to such a degree that she is rendered manifestly unable to comprehend the nature of her conduct and thus cannot give effective consent. See Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 5.11 (1986); Model Penal Code § 213.1(1)(b) (1980). The modern trend in cases of voluntary intoxication is both to require the degree of incapacitation be extreme to the point of unconsciousness, see David P. Bryden & Sonja Lengnick, Rape in the Criminal Justice System, 87 J. Crim. L. & Criminology 1194, 1347 n.875 (1997), and to permit a defense for reasonable mistake, see, e.g., Coley v. State, 616 So. 2d 1017 (Fla. App. 1993).

Although the allegation that Bonjean "plied" Halvorson with alcohol is troubling, the record indicates that Bonjean used, at most, social pressure to encourage Halvorson to drink. Bonjean may have made the wine seem appealing by swirling it in his glass and discussing how it would enhance the flavor of the appetizers, but it is hard to see how that and his frequent references to "partying" could overbear her will in a legally significant way. Moreover, there is no indication that Halvorson's voluntary intoxication defeated her capacity to declare Bonjean's advances unwelcome. Halvorson testified that she not

only chatted with Bonjean about "work-related" topics on the way to her hotel (Kitchak Aff. Ex. N at 272) but also engaged in several lengthy phone calls immediately after their sexual encounter about topics ranging from her boyfriend's Corvette and her day at work to her sexual relations with Bonjean (id. at 301-312). Thus, Halvorson's otherwise wanting sex discrimination claim is not bolstered by analogy to modern rape law.

Granting Halvorson the benefit of every factual inference, the Court concludes that a reasonable jury could not find that Halvorson indicated to Bonjean by her conduct that his advances were unwelcome. Halvorson testified that she was motivated to bring this suit because:

> I feel in a work situation a person should never have to worry about being in a situation where they're forced to do something they have a weakness for like alcohol. When you're an alcoholic and the company is aware of it, it should never have been an issue, and alcohol should never have been an issue. And certainly a sexual relationship with someone you work with should never have been a possibility at work.

(Id. at 327.) While Title VII and the MHRA establish certain workplace parameters, they do not require employers to ensure that their employees abstain from the voluntary consumption of intoxicating beverages or refrain from unwise romantic liaisons. As the Supreme Court has noted, "[The] standards for judging [workplace] hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher v. City of Boca Raton, 524 U.S. 775 (1998). Because the court finds that there

is no genuine issue of material fact and Conseco Finance is entitled to judgment as a matter of law, summary judgment is appropriate.

## II. Vicarious Liability

Even were Halvorson able to establish a dispute of material fact on the basis of her encounter with Bonjean, she has not made the showing required to demonstrate that liability should attach to Conseco Finance. Because sexual harassment generally does not occur within the scope of employment, plaintiffs in sexual harassment cases must rely on several alternate theories to impose liability on their employer. See Ellerth, 524 U.S. at 756-60; Faragher, 524 U.S. at 593-802. For instance, an employer may be subject to vicarious liability for a hostile work environment created by a supervisor with immediate or successively higher authority over the employee. Ellerth, 524 U.S. at 759-60; Todd, 175 F.3d at 597. Alternatively, in the unusual case where there is a false impression that the harasser possessed supervisory authority over the employee, the employer may be held liable so long as the employee's mistaken belief is a reasonable one. Ellerth, 524 U.S. at 759. Where the harasser is not a supervisor but instead a coworker, an employer may be held liable if the employee complains about the harassment and the employer fails to take proper remedial action. Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 566 n.5 (8th Cir. 2000).

Here, Halvorson has not made the showing required for liability to attach because she has failed to take into account Conseco Finance and Conseco Agency's status as

separate legal entities. While Halvorson uses the name "Conseco" throughout her moving papers to describe both Conseco Agency and Conseco Finance (see Pl.'s Opp'n Mem. at 1, 16) and Halvorson's counsel insisted that he "make[s] no distinction" between the two companies (see Kitchak Aff. Ex. O (Serrano Dep.) at 8) the only evidence before the Court with regard to their corporate structures indicates that they are, in fact, distinct. The second and third paragraphs from the Affidavit of Brian F. Corey, Senior Vice President, General Counsel, and Secretary for Conseco Finance clearly states:

> 2. Conseco Finance Corp. is a corporation organized under the laws of the State of Delaware;
>
> 3. Conseco Agency, Inc. is a corporation organized under the laws of the State of Minnesota and is a wholly-owned subsidiary of Conseco Finance Corp.

(See Corey Aff. ¶¶ 2, 3.) This evidence is not rebutted.

Although courts do, under certain circumstances, hold parent companies liable for the acts or omissions of their subsidiaries, the plaintiff has the burden of demonstrating that it is appropriate in a given case. See, e.g., H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531, 1549 (8th Cir. 1989) (holding that parent company cannot be held liable for acts of subsidiary without proof that it performed acts sufficient to create liability or actively influenced subsidiary in its violations); Sedlacek v. Hach, 752 F.2d 333, 334-36 (8th Cir. 1985) (holding that two companies that shared employees, management, equipment, location, and employee benefit programs could be consolidated for counting purposes under Title VII's numerosity requirement); Frank v. U.S. West,

Inc., 3 F.3d 1357, 1364 (10th Cir. 1993) (holding that only one common manager, no unified day-to-day operational control, and common ownership was insufficient to establish consolidation under numerosity requirement); Watson v. Gulf & W. Indus., 650 F.2d 990, 993 (9th Cir. 1981) (refusing to hold parent corporation liable for Title VII violations of its wholly-owned subsidiary in absence of evidence of parent company's participation or influence).

Given that Halvorson and Bonjean worked for different employers, and without evidence or analysis indicating that the companies should be treated as one, a reasonable jury under even apparent authority analysis could not conclude that Halvorson had a reasonable misimpression that Bonjean was her supervisor. Halvorson testified that Bonjean did not set her salary, did not give her performance reviews, and did not hire her; she also testified that she viewed Conseco Agency as an "internal customer." (Id. at 334, 188-89.) While a company should not be able to shield itself from liability by segmenting its operations into different corporate units, see generally Papa v. Katy Industries, Inc., 166 F.3d 937, 941 (7th Cir. 1999) (Posner, J.), the plaintiff must at least provide the basic information for the Court to decide whether piercing the corporate veil is appropriate in a given case. Thus, even were Halvorson able to prove she had been harassed by an employee of *Conseco Agency*, she has not adduced sufficient evidence to hold *Conseco Finance* liable.

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that Defendant Conseco Finance Corp.'s Motion for Summary Judgment (Doc. 19) is **GRANTED.** The Amended Complaint (Doc. No. 14) is hereby **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 21, 2002

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*